Good morning ladies and gentlemen. The first case we have for argument is Kisiyan v. Gonzales. The counsel for petition is going to argue by telephone. Can you hear us, counsel? Yes, I can hear you well. Thank you. All right, you may proceed. Good morning, Your Honor. It's Ina Lipkin on behalf of the petitioner. This is an asylum withholding of removal and convention against torture claim that was originally denied by the immigration judge and that opinion was affirmed by the Board of Appeals. However, the petitioner contends that both the immigration judge and the board erred in denying the application for what both bodies found were credibility problems and a failure to establish a nexus on a protected ground. However, the petitioner contends that any incredibility findings that the judge had made were basically based on speculation and conjecture and not on any inconsistencies in the record. Secondly, the petitioner contends that she did establish a nexus of persecution. The main nexus would be the fact that she is married to an ethnic Russian who is also Muslim. She herself is an Armenian who is a Christian. And because of the social group of which she is a member of, that is, the family group consisting of her husband, the authorities, particularly in the form of this Captain Eratunian, targeted her and felt that it could target her because of the relationship with her husband. Counsel, this is Judge Fisher. A question I have is you seem to have raised a more general as well as the more specific social group, the more general group being that of a social group of women in general as opposed to, in this case, as you've just articulated, the narrower group of, if you call it a social group, of a woman who is married to, I guess he was what, Russian is what he considered, and a Muslim. So in that sense, the group seems to be identified more by political and religious grounds, which is somewhat duplicative if you then try and extend it to creating some broader social group. So where are you going with her status as a woman? That would be helpful if you could clarify that. I think her stronger argument, based on the facts of this case, is that, in fact, she was really targeted due to her status as a member of the social group consisting of her family. Although there are references, especially in the Department of State report, that violence against women is widespread. That's on the administrative record, page 145, exhibit 6. I do think that she has a stronger argument based on the difference in the ethnicity and the religion of her husband. So by stronger argument, you mean if you lose the argument on the narrower social group, then you must lose the argument on women? No, Your Honor. I simply feel that it makes more sense to argue this because of the comments made to her by Captain Arutunian and the other facts of the case. Well, that's fine. And if you lose on that argument? Well, I don't think she would have as strong an argument. Does that mean you're not pressing the argument or you just don't like your argument? Well, it was an argument that was presented before the immigration judge. I was not the attorney at the time, and I feel after review of this case that really she was targeted due to her membership in the social group consisting of her husband. And there's also a recent case that I mentioned in my additional citation, Thomas V. Gonzales, in which the United Circuit upheld that a family can constitute a social group for the purposes of the refugee gap. That was reversed and remanded. Well, it was remanded on a narrow issue. It went to the Ninth Circuit. It went to the Supreme Court, and the Supreme Court found that based on, I think it was Ines v. Orlando Ventura, the Ninth Circuit couldn't instruct the immigration judge to—pardon me, the Ninth Circuit couldn't remand on its own. It had to remand to the immigration judge to make that finding itself. But the Supreme Court didn't reverse the rule that was set forth in that case, which was that a familial tie can constitute a social group which is protected. I thought it said that we had to leave that determination initially up to the BIA. I'm sorry, Your Honor. Could you repeat that? Yes, I thought it said that we have to leave that determination initially up to the BIA, that they had not had an opportunity to decide that, or at least that they hadn't decided the question. Right. You are correct, Your Honor. But the holding that the Ninth Circuit made has not yet been reversed, just the fact that whether the Ninth Circuit has the jurisdiction to reverse it on its own. And, of course, the Supreme Court said it's not. This is Judge Clifton. Excuse me. Good morning, Your Honor. Let me ask you, to relate more closely to the facts of this case, it appears to be the conclusion of the agency and the argument of the government that she's not being singled out because of one of the enumerated grounds, but rather because she was attractive to somebody else who lived in the same building and somebody else happened to be a captain in the security service, but nothing that suggests it's one of the enumerated grounds. What's wrong with that conclusion? Well, there's two aspects of that conclusion that I would disagree with. On the one hand, even if that was partially true, this Court has stated many times that a mixed motive still constitutes a ground for persecution, and I will explain why. First of all, the record seems to indicate that Captain Erdstein would not have perhaps targeted the petitioner had she not been married to someone who in the Armenian society was deemed to be undesirable, that is, of Russian ethnicity and, more importantly, of Muslim religion. The comments that he made to her when she complained about the false arrest of her husband, the comments made to her that he was scum and some of the derogatory comments regarding his religion and his ethnicity clearly point out to the fact that she was targeted because of the familial tie with her husband. Had he been Armenian, she may not have been targeted. Counsel, you've got a little over three minutes. Would you rather save that for rebuttal? I would. Thank you, Your Honor. Counsel. Good morning, Your Honors. My name is Greg Kelch, and I represent the Attorney General. Petitioner Kisyon's asylum application was denied for two reasons. First, the IJA didn't find her credible and didn't believe these rape allegations. But second, even if true, the petitioner failed to demonstrate that she was raped on account of one of the grounds that are protected by the INA. Now, we do not conceive petitioner's credibility, but I'd like to focus my remarks this morning on that second reason. That is, even if these rape allegations were true, the record does not compel a finding that petitioner was raped on account of a race, religion, nationality, membership in a particular social group, or her political opinion. Can you rule out that that wasn't a likely part of the motive? You mean a mixed motive? Exactly. Well, Judge Fischer, the record does not compel any finding that there was, that Artunian was motivated. Well, why not? I mean, it seems there is a whole lot of evidence about the actions of this captain, which indicates his hostility toward the woman's husband. And the IJA seemed to, both based on what I consider to be speculation about what a woman would do in those circumstances, and the notion that he was really after her, and indeed she may have been a willing participant in this affair, as he called it. I guess it's a male IJA. But there was evidence that this fellow was involved in the arrest of the husband, as counsel for the petitioner just said, where he made derogatory comments about the wife's husband. And he is an official of the government. All of those things sort of add up to at least some aspect of mixed motive. What do we do with that? Well, first of all, Judge Fischer, we would disagree with the premise that there is a lot of evidence in this record that Captain Aratunian had animus towards Russian Muslims. Remember that Captain Aratunian was an old acquaintance of the petitioners. They knew each other in childhood. Of the petitioner. Of the petitioner, yes. Not of her husband. Not of her husband, no. Right. So I don't know how that helps you at all. Well, Your Honor, when the petitioner and her husband moved into the same apartment building where Captain Aratunian lived, from June 2000 to October 2000, Captain Aratunian had no problems with the petitioner. They had friendly chats when they saw each other in the hallways. With the petitioner. With the petitioner, correct. In fact, she writes in her asylum application. Where does that get you? The problem, what we're trying to understand here, are we not, is whether or not his affection for or sexual attraction to the petitioner was colored in part or motivated in part the actions that he took by his animosity toward her husband. If anything, one could argue that, I mean, along the IJ's analytical track, is that what he was doing was trying to get rid of a rival or somebody he was unhappy had married this woman. But the, it seems on the record, there's a lot of animosity toward the husband in part because of his ethnicity and or his religion. But, Judge Fischer, our point on that is that what in this record compels that conclusion? Let's look instead at Captain Aratunian. Facts. But let's look at Captain Aratunian's conduct during the rapes. As the petitioner describes it, before the first alleged rape, the way it began was he saw her in the hallway and expressed sympathy that her, that her husband had been arrested. And he was offering help. Do you think that was genuine sympathy? No. No. Probably not. If this story is true, then that likely is, and it was an insincere offer of help. But that's very different from saying to her, you are a traitor to the country because you married him. And now that he's out of the picture, you're going to be with me. The only time, Judge Reinhart, that Captain Aratunian is ever reported to make any comments at all about the religion and ethnicity of the petitioner's husband is in October 2000, after he had asked her out for a date and she said no and turned him down. At that point, she says that he called her husband some nasty names and made fun of his religious beliefs. Do you think that the IJ's report considers the question of mixed motive? It seems to me that when the IJ decides that the captain was sexually attracted to the woman, the IJ decided that was the end of the case. He says it's because the captain wanted to be with the respondent,  Well, assuming that the predominant reason was that he found her sexually attractive, I don't really see where the IJ considered the issue of that you can be sexually attracted, that can be the predominant reason for the rape. But it may be that a part of the motive is that she's more vulnerable because her husband is a Muslim and now has been taken off to jail, or that it's for any reason. He considered that factor in deciding that this was, that he was free to rape her. Well, Judge Reinhart, I apologize. I don't have recollection of the IJ's opinion at this moment where he specifically said that he was considering a mixed motive analysis. Our position is that it appears to us from looking through his opinion that he considered the testimony where Petitioner said that her husband had said these derogatory comments. He considered it, but then he went on to say that the reason he raped her was he wanted to be with her, which is true, but it doesn't really dispose of the issue of whether there was a mixed motive. But substantial evidence does support the finding that there wasn't a mixed motive in this case. Well, that's the issue. Even assuming that's true, if the issue wasn't considered by the IJ and he didn't make a ruling on it, we would have to remand. Well, I don't recall that this was specifically raised at the trial level, that that is, that there were two motives. She was arguing that it was the only motive was her membership in a particular social group and imputed anti-nationalist political opinion. So Petitioner has to make the explicit statement that if you don't buy my motive then in whole, then you have to at least consider it in part? Don't you think every IJ in the system does or ought to know that, that it's a mixed motive, at least in this circuit? I understand your concerns. I didn't mean it to be an unfriendly question, but I just am wondering. I would think the IJs in this case, in this circuit, would know that it just leaps out at you. Is there more than, yes, you may find there was, I mean, it seems obvious on its face that this guy was after her because of a normal male-female attraction of a violent nature, but that there was evidence, as she was trying to emphasize, that it was more than just that. Even if, in fact, she was trying to say it was all that, but assume it wasn't all that, it was only in part that. Our concern with that analysis, Judge Fischer, is that it seems, this really seems to be changing the theory of the case as it's moved throughout the appellate as it moves throughout the appellate statutes. I don't understand why it's a challenge. That I don't understand. This is a very human circumstance in a certain degree of common sense. She's saying that he raped me because of my husband's ethnicity and his animosity based on that. And the IJ clearly looked at this woman, even commented on her flat affect when she was testifying as part of his demeanor finding. And he was persuaded based on his, what, again, I refer to as speculative notions about what a woman should have done if she were truly offended by this rape. He concluded completely in the other direction, leaving no, it's an all or nothing proposition. I don't think it's changing the character of the case. I think very much so that the guy probably was motivated by sexual perversion, but just directed at the woman. But, of course, sexual perversion is not. I understand. I understand. She doesn't win on that. That's what the IJ. But the question is, I'm left with this serious concern that the IJ didn't focus on the middle position, which is, yes, you're right about that. He was definitely after her, but there was a reason for it in addition to just ordinary garden variety, out of control male aggressiveness. But from June 2000 until October 2000, they had friendly relations. He never seemed to indicate that he was projecting an anti-nationalist political opinion on her. But when he made his move, and she rejected him, then it all came out. Exactly. Well, when she he You said yourself that's when he, when thwarted, he then said nasty things about her husband. He did, but it seems, and may I have a few extra moments, Judge Reinhardt? My time's expired. All right. We'll give you another minute. Thank you. But it, okay, but we had this scenario in October 2000 where he asked her out for a date, and she says, no, I want to be with my husband instead. And yes, he did make statements about her husband's ethnicity and religion. But then look afterward. Afterward, as she describes the rapes as they're happening, as she describes all of her interactions with him, he never comes back to expressing more animosity about the issue of her husband's ethnicity. It appears to us that whatever he said in October 2000 indicates his personal insult or frustration, rather than a desire to harm her due to her husband, due to one of the protected grounds. Thank you. Thank you, counsel. All right. Ms. Lipkin? Yes. I just want to comment in rebuttal, Your Honors. The fact that this captain, using his official government capacity as a government official, was able to orchestrate this arrest of the husband, falsely planting narcotics in the home, in order to remove him from the area, if in fact this is a mixed motive case, that he would then have full access to the petitioner, clearly shows that he was using his power as a government official to target the petitioner and to target her husband because of his, let's say, lowered status as a person of Russian ethnicity and a Muslim in Armenia. Thank you. Thank you, counsel. The case just argued will be submitted. The next case for oral argument is Hamdi v. Gonzalez. Thank you.
judges: Reinhardt, Fisher, Clifton